**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

In re

**BOBBY D. ADEE and**
**JOHNANN H. ADEE,**

      **Debtors.**      **Bankr. D.N.M. No. 11-94-11148**


**CREDITORS LIQUIDATING TRUST,**
**FIRST NATIONAL BANK OF CLAYTON,**
**CRAIG REEVES, ROBERT O. BECK,**
**BECK & COOPER, LAWYERS, AND**
**STANLEY MANSKE,**

       **Appellants,**


**v.**             **No. CIV 02-1330 MV/LFG**


**UNITED STATES OF AMERICA,**

       **Appellee.**


**MAGISTRATE JUDGE'S ANALYSIS**
**AND RECOMMENDED DISPOSITION ON**
**BANKRUPTCY APPEAL**[1]

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

## Introduction

This matter is before the Court on an appeal[2] by Creditors Liquidating Trust, First National Bank of Clayton, Craig Reeves, Robert O. Beck, Beck & Cooper, Lawyers, and Stanley Manske, Appellants ("Appellants" or "CLT") from the United States Bankruptcy Court's Order Sustaining United States' Notice of Perfection of Security Interest and Notice under 11 U.S.C. § 546(B) in Lieu of Seizure of Property and Denying [CLT's] Motion for Order Declaring Void the Notice of Perfection of Security Interest, filed October 22, 2002 in 11-94-11148. The parties submitted appellate briefs and exhibits. [Docs. 6, 7, 8.] No oral argument is necessary. After considering the pleadings and briefs, the underlying Bankruptcy transcripts and record submitted in four volumes, and the pertinent law, the Court concludes that CLT's appeal is well taken. Therefore, the Court recommends that the Bankruptcy Court's decision be reversed and that this matter be remanded as explained further below.

## Summary of Dispute

Appellee United States Farmers Home Administration ("FmHA" but now known as Farm Services Agency) claims that it is entitled to a significant part of approximately $370,000 recovered by Appellant Creditors Liquidating Trust ("CLT") from the proceeds of a separate class action settlement involving mineral royalty payments. The mineral royalty payments derived from properties owned by Bobby and Johann Adees. Farm Services Agency's claim to these proceeds is predicated upon two mortgages on real estate that the Agency took to secure loans it made to the Adees in 1978. The Adees defaulted on their loans and eventually filed for Chapter 11 bankruptcy. As part

---

[2]The Appellants elected to have their appeal heard by this Court instead of the Bankruptcy Appellate Panel pursuant to 28 U.S.C. § 158(c)(1) and Rule 8001(e) of the Federal Bankruptcy Code. [Doc. 2.]

of the bankruptcy proceeding, a Plan of reorganization proposed that CLT would take title to all of the Adees' assets, including claims against third parties, and that CLT would liquidate those assets for the benefit of unsecured creditors. The Disclosure Statement for the Plan identified, among other things, that CLT would be taking and liquidating the Adees' interest as members of the above-mentioned class action involving mineral royalty payments.

Appellant CLT disputes that Farm Services Agency is entitled to any of the proceeds it collected from the class action settlement. CLT further argues that Farm Services Agency released any claims it might have had to those proceeds as a result of the settlement of a separately filed foreclosure lawsuit brought by the United States against Bobby and Johnann Adee and others. That foreclosure action involved the subject real properties, upon which the mineral royalty payments were made.

## Background

The present issue traces back to real properties owned by the Adees. In 1978, the Adees borrowed money from Farm Services Agency (formerly FmHA). To secure payment on the Notes, the Adees executed and delivered mortgages on certain real properties to the Farm Services Agency. The mortgages conveyed the Adees' interests in the surface and whatever mineral interests the Adees had at the time to the government. [May 23, 2001 Hearing, Tr. at 8.][3] The Adees defaulted on their payments in the early 1980's, and the properties were subject to foreclosure (although the United States did not file for foreclosure until years later). In April 1994, the Adees filed a Chapter 11 petition in bankruptcy court. [Doc. 1, in 11-94-11148.] On August 11, 1994, the United States filed

---

[3]All exhibits or hearing transcripts referenced in this opinion are contained in binders that were supplied to this Court as part of the record on appeal.

its Proof of Claim in the bankruptcy proceeding, showing a secured claim of $1,795,200.00 and an unsecured portion of $248,195.34.  The appeal before this Court involves Farm Services Agency's claim of secured interest that was filed in the bankruptcy action.  [May 23, 2001 Hearing, Tr. at 3.]

In order to satisfy the indebtedness that Farm Services Agency claims it is still owed on the Adee loans, the Agency asserts that it is entitled to certain monies recovered by CLT from proceeds of a settlement of a separate class action lawsuit, Feerer v. Amoco, No. CIV 95-12 JC/WWD ("Bravo Dome Settlement").  The Feerer class plaintiffs, which included the Adees (or subsequent purchasers of the properties in question), litigated against Amoco on behalf of mineral rights claims, including claims related to the subject Adee properties, and alleged that Amoco had not paid the proper amount of royalty payments to mineral interest holders.  [Jan. 22, 2002 Trial Tr. at 53, 79.]  The Settlement Agreement in Feerer was signed on March 31, 1998.  [Ex. W.]

CLT filed a proof of claim, on behalf of itself and other "unsecureds" as to some of the mineral royalty settlement monies.  [Jan. 22, 2002 Trial Tr. at 12, Ex. BB.]  The Bravo Dome settlement monies recovered by CLT on May 18, 1999 amounted to approximately $370,000, some of which were paid out in taxes.  [Jan. 22, 2002 Trial Tr., at 74-75; Jan. 25, 2001 Hearing, Tr. at 20; Ex. EE.]  The United States claims that it is entitled to about 2/3 of that settlement amount, based on its perfected security interest in the mineral royalties at issue,[4] that it filed in the underlying bankruptcy litigation.  [Id., at 90, 98, 99, Id., at 21.]

CLT argues that while the United States held mortgages on the properties for which mineral royalties were paid, the United States released those mortgages as a result of the settlement of a

---

[4]The government does not claim that it is entitled to all of the mineral royalty payments obtained by CLT because some of the subject acreage that produced mineral income was not affected by the United States' lien. [Jan. 25, 2001 Tr. at 11.]

separately filed foreclosure action.  In order to better understand the history and complexities of the current appeal, the separate foreclosure action must be discussed to some degree.

On February 24, 1999, the government filed the above-referenced foreclosure action [No. CIV 99-188 BB/RLP] in federal court against the Adees, Alamo Ranch Partnership, Painted Mesa Development and other corporate defendants, seeking to foreclose the very same mortgages at issue here.  [Ex. Q.]  The real property at issue in the foreclosure action was some of the same real property for which mineral royalty payments would subsequently be made in the class action lawsuit. [May 23, 2001 Hearing, Tr. at 9.]  In the foreclosure action, the government claimed that the Adees owed principal and accrued interest as of 9/15/97 in the amount of $2,320,586.98.  [Ex. Q, p. 9.] Several of the corporate defendants denied the claims and asserted affirmative defenses including a statute of limitations defense.

The Adees never filed an answer in the 1999 foreclosure action and took little part in that lawsuit, but on September 23, 1999, Sharon Loden and Dowlen Adee were substituted in that action as conservators of the Adees, who were considered by the corporate defendants to be "only nominal defendants in this case having no right, title or interest in the property identified in the [government's foreclosure] Complaint" [docs. 19, 21, 30 at p. 6, in No. CIV 99-188], as the Adees' interests had been assumed by other defendants.

The government's foreclosure claim was challenged and, as indicated, a statute of limitations defense was asserted.  The government filed a motion for summary judgment in the foreclosure action that was fully briefed but never decided.  While the conservators of the Adees did not oppose the

motion for summary judgment, Defendants Alamo Ranch and Painted Mesa[5] did oppose the motion

on a number of grounds.    [Docs. 30, 31, in No. CIV 99-188.]  One of Defendants' arguments in

opposition to summary judgment was that the Farm Services Agency was barred by the 6-year statute

of limitations in initiating a foreclosure action in 1999, after electing not to pursue its claims from as

far back as 1983 when the government accelerated the delinquent accounts.  [Doc. 30, pp. 4-7.]  In

attempting to explain why the government suddenly, in 1999, decided to file the foreclosure action

after not pursuing the Adees for so many years, Defendant Alamo Ranch made this argument:

> During and subsequent to the 1993 state court [foreclosure]
> proceedings, the Adees became involved with a radical anti-
> government group called "We the People" and engaged in vexatious
> activities such as filing bogus liens against FmHA personnel,
> submitting bogus worthless "drafts", and filing meritless lawsuits.
> After being harassed by the Adees, the FmHA apparently became
> interested in pursuing its stale claims.

[Doc. 30, p. 6, in No. CIV 99-188.]

A non-jury trial in the government's disputed foreclosure action was scheduled for a call of

the calendar on February 15, 2000.  However, on January 21, 2000, United States Magistrate Judge

Robert DeGiacomo facilitated settlement of the government's foreclosure litigation.  [Jan. 22, 2001

Trial Tr. at 25.]  The settlement included the later purchasers of the Adee property and the

government.[6]  [May 23, 2001 Tr. at 14-15; Jan. 22, 2001 Trial Tr. at 68.]

---

[5]Defendant Alamo Ranch acquired some of the property at issue in 1993, after First National Bank in
Clayton brought a foreclosure action in state court.  Similarly, Defendant Painted Mesa acquired some of the
property at issue in 1993 after the same state court foreclosure.  [Doc. 30 at p. 6, in No. CIV 99-188.]

[6]The history of who subsequently purchased the Adee properties is described during the January 22, 2002
trial.  Ray and Claire Snead apparently purchased some of the subject property after a state foreclosure action in
1993.  The Sneads later transferred the property to Alamo Ranch Partnership.  [Jan. 22, 2002 Tr. at 68-69.]  Mr.
Beck, counsel for CLT in this appeal, represented the Sneads in the application process for the Bravo Dome
settlement funds.  [Id. at 78.]  Mr. Beck also represented Alamo Ranch and Painted Mesa in the federal foreclosure
lawsuit.  [Doc. 40, in No. CIV 99-188.]

By the time of the settlement conference, the amount due on the loan to the government was $2,504,266.90.  [May 23, 2001 Hearing Tr. at 14.]  So as to eliminate risk as well as the expenses of trial and appeal, the government settled for less than it was owed.[7]  In exchange for a release of claims and liens on the subject mortgages, the government was paid $1,568,000.  [Ex. S.]  The settlement brought an end to the government's claims against the Adees and released all right, title and interest the government had in and to the subject properties.  The settlement also ensured that the government would receive money, albeit less than it was owed, and the government avoided the risk that the affirmative defense relating to the statute of limitations might defeat its claim.

As a result of the foreclosure settlement, the Farm Services Agency prepared and filed Satisfaction of Liens that released and discharged the subject mortgages.  [Exs. C, E, G.] Based on the Satisfaction of Liens, CLT asserts that everything that could or may have been covered by those mortgages returned to the original owners of the properties (the Adees) and that CLT, which had acquired the interests, stood in the shoes of the Adees at that point.  [Jan. 22, 2002 Tr. at 110-111.] Thus, CLT contends that it is entitled to the mineral royalty payments subsequently obtained as part of the Bravo Dome Settlement.  Farm Services Agency disagreed and contended that the settlement of the foreclosure action did not result in the Agency's receipt of the full measure of accumulated damages due it under the disputed notes and mortgages, and therefore, claimed that it was entitled to the Bravo Dome settlement proceeds to make it whole.  CLT filed a timely claim in the Bravo Dome class action, and the government did not.  Had CLT neither filed the claim nor obtained the settlement monies, there would be no royalty payments to argue over.  [Jan. 22, 2002 Tr. at 95-96.]

_____

[7]Also credited against the Adees' indebtedness was the amount of $675,000, obtained from a different foreclosure action in Oklahoma.  [Jan. 22, 2002 Tr. at 43-44.]  These two figures together are close to the amount initially requested by the government, although still below that figure.

In a thoughtful and well-written opinion, Judge Starzynski disagreed with CLT's position. The United States persuaded the Bankruptcy Court that Christian Andersen of the Farm Services Agency made a "clerical error"[8] in preparing complete satisfaction of liens and releases used for the foreclosure settlement, and that therefore, CLT's releases were ineffective.  More specifically, the United States asserted that in 1994, it filed a Proof of Claim in the underlying bankruptcy action, and perfected its interest in the mineral royalty payments.  [Ex. M.]  The proceeds of the Bravo Dome settlement came into CLT's possession after the United States perfected its claim and before the government settled the foreclosure litigation and issued Satisfaction of Liens and releases on the subject mortgages.  [Jan. 22, 2002 Tr. at 90.]

Moreover, Mr. Andersen testified that he believed that the settlement of the foreclosure action had nothing to do with the proceeds at issue in the bankruptcy matter, namely the mineral royalty payments.  [Id. at 21, 92.]  He further explained in the foreclosure settlement, that the Sneads (when they purchased the property) did not pay what was actually still owing on the government's

---

[8]The United States' theory of "clerical error" was raised in the middle of the bench trial before Judge Starzynski.  During the first day of the trial, there was no discussion of a possible clerical error.  [See May 23, 2001 Transcript; Sept. 4, 2001 Tr. at 8.]  The government's position then was that the satisfaction of lien entered in the foreclosure case had no effect on the bankruptcy action and its proof of claim.  In other words, the United States had a perfected security interest in the property at issue, and the mineral interest was part of that real estate, so the government was entitled to the mineral royalty payments, without regard to what occurred in the foreclosure settlement.  On the first day of the trial, counsel for the government stated that "[t]hose are the only issues that are of importance here."  [May 23, 2001 Tr. at 15-16.]  Counsel for CLT argued that the government could have used a partial release in the foreclosure settlement that would have cleared title to the property for the subsequent purchaser, and by doing so, retained any claim of lien it had upon the royalties.  Instead, the government prepared a complete satisfaction of lien.  [Id. at 19.]  The Court continued the trial proceedings because the judge determined that the matter was not fully ready for trial.  [Id. at 50.]  During the intervening months, the United States contacted counsel for CLT and raised the new defense of "clerical error."  CLT then filed a motion in limine as to the government's sudden change of theory, but the motion was denied based on the court's finding that the matters should be addressed on the merits.  [See Sept. 4, 2001 Transcript; Jan. 22, 2002 Tr. at 3.]  During the second and last day of the bench trial, counsel for the government explained that its newly raised theory concerned only a "clerical error."  In other words, the United States was not raising a defense of "mistake" because it had not included that theory as an affirmative defense.  [Jan. 22, 2002 Tr. at 6-7.]

promissory notes but merely the market value of the property.  [Id. at 18.]  In a classic "have your cake and eat it too" argument, Mr. Andersen acknowledged that the government settled the foreclosure case for less than what was owed on the notes, with accrued interest, and contended that the settlement still did not result in the government receiving all that it was due.  Notwithstanding the executed satisfaction of liens and having received the benefit of the settlement, Mr. Andersen recognized that following the settlement, the government released its claims to the property but argued to the bankruptcy court that in his mind there was still a balance due and owing on the property.  [Id.]  Mr. Andersen conceded, however, that he would handle the release differently now if he could, most likely by preparing a partial release or satisfaction of lien, or by spelling out more specifically what was excluded by the satisfaction of liens.  [Id. at 21, 28-29, 39, 51, 92.]  Counsel for the government further explained that Mr. Andersen understood that "what he did was probably not conducive to the government recovering – I am putting words in his mouth – conducive in recovering what we're after today."  [Id. at 106-07.]

During the bankruptcy bench trial, counsel for the government defined the alleged error that occurred as follows:

> It was that it was a satisfaction of lien as opposed to a partial release of lien.  Had he [Christian Andersen] realized that the proceeds in this Court were real estate basically, then he would have done the partial release of lien [in the foreclosure action].  That's where the clerical error was.

[Id. at 107.]  CLT presented five theories as to why the government's claim to the settlement proceeds should be denied.  The government persuaded Judge Starzynski that there was an error, and therefore, the Bankruptcy Court rejected all of CLT's theories.  Judge Starzynski explained the mistake in the following terms:

> I guess it does seem to me at this stage there was a mistake.  I don't know whether it was a clerical mistake. . . . Again, it gets back to the issue of whether this comes within the realm of clerical mistake.  If it does come within the realm of clerical mistake, should the judgment or should the mortgages or whatever effectively be interpreted as the government wishes or not.  But it does seem to me, and I have a real question, was it that everybody simply forgot about the bankruptcy proceeds or was it really clear to the CLT when it was looking over documents and so forth that there may be an avenue here to secure from the Bravo Dome proceeds a chunk of them that it might not otherwise be able to get to.  I don't know.  But there's no evidence with respect to that.  And so I am going to have to think about whether – I mean, everybody is allowed to think about that issue.

[Id. at 120-21.]  At an earlier hearing, Judge Starzynski correctly noted that "[t]o me clerical mistake means I'm writing a number into a judgment and I accidentally type a 9 instead of a zero or something like that."  [Sept. 4, 2001 Tr. at 10.]

The sole issue on appeal is whether the Bankruptcy Court correctly determined that the Farm Services Agency's release of all of its claims following settlement of the foreclosure suit, rather than only a partial satisfaction of liens, constituted a "clerical error."

## Standard of Review

Both parties agree that legal conclusions by the Bankruptcy Court are reviewed *de novo*, In re Albrecht, 233 F.3d 1258, 1260 (10th Cir. 2000), and that factual determinations cannot be disturbed unless they are "clearly erroneous."  In re Miniscribe, 309 F.3d 1234, 1240 (10th Cir. 2002).  [Doc. 7, p. 8; Doc. 6, p. 16.]  However, the parties differ somewhat in whether the present issue involves only factual or legal determinations.  The United States asserts that the issue in question involves a factual determination by the Bankruptcy Court; therefore, the decision is reviewed for clear error.  CLT contends that this is a case involving a mixed question of law and fact, and that either standard could apply depending on whether the issue is primarily a factual inquiry or a

consideration of legal principals.  CLT further argues that the Bankruptcy Court's determination that the Satisfaction of Lien was "ineffective" is an error of law subject to a *de novo* review.  In addition, CLT asserts that reversal is warranted even under a clearly erroneous standard of review because there is no evidence that the Satisfaction of Lien was prepared in error.  [Doc. 8, p. 2.]  The Court finds that under either standard of review, reversal and remand are warranted.

### Analysis

**A.     Rule 60 Relief:**

The issue on appeal is somewhat troublesome to address because the United States never clearly articulates what legal basis supports its defense of "clerical error."   The phrase "clerical mistake" as thoughtfully and appropriately noted by Judge Starzynski, is found in Rule 60(a) which allows relief from a judgment or order on grounds of clerical mistakes.  Further, Rule 60(b) allows relief from a "final judgment, order, or proceeding" when there is "mistake."   The United States, however, never states that it is attempting to obtain Rule 60 relief through its assertion of clerical mistake.  Nonetheless, CLT submitted authorities and argument to the Court on the clerical error defense, along with discussion of why Rule 60 relief should be unavailable.   In addition, the Bankruptcy Court commented on Rule 60 relief at one point during the trial, as if that rule were the legal basis for the United States' theory of "clerical error."

> Court:  Rule 9024 incorporates Rule 60(a) which says that a clerical mistake in a judgment, order or other part of the record and errors therein arising from oversight or omission may be corrected by the court . . . . What we're talking about here is a mistake  in judgment, order or other part of the record and errors therein arising from oversight or omission.

[Jan 22, 2001 Tr. at 107]  Yet, in holding that a clerical error had been made by the United States, the Bankruptcy Court found that the CLT's arguments concerning Rule 60 were not well taken as Rule 60 involves relief from a judgment or an order, contrary to the issue at hand.

This Court agrees with CLT that Rule 60 does not support the government's defense of clerical mistake.  For one thing, the party asserting such a defense under Rule 60 bears the burden of proof of demonstrating the prerequisites for such relief, and the government does not even allude to Rule 60 in its explanation of the "error."  *See* Gomes v. Williams, 420 F.2d 1364, 1366 (10th Cir. 1970); McCurry ex rel. Turner v. Adventist Health Sys./Sunbelt, Inc., 298 F.3d 586, 592 (6th Cir. 2002).  Moreover, while Rule 60(b) lists six substantive grounds for relief, including mistake, typically carelessness or ignorance of the law are not construed as a "mistake" for purposes of the rule.

The Court, therefore, concludes that Rule 60 cannot be used to correct substantive errors of the nature present here.  "As long as the intentions of the parties are clearly defined and all the court need do is employ a judicial eraser to obliterate a mechanical or mathematical mistake, the modification will be allowed" under Rule 60(a).  In re West Texas Mktg. Corp., 12 F.3d 497, 504-05 (5th Cir. 1994).

> If, on the other hand, cerebration or research into the law or planetary excursions into facts is required, Rule 60(a) will not be available to salvage the government's blunders.  Let it be clearly understood that Rule 60(a) is not a perpetual right to apply different legal rules or different factual analyses to a case. It is only mindless and mechanistic mistakes, minor shifting of facts, and no new additional legal perambulations which are reachable through Rule 60(a).

Id.  Here, it is not as simple as applying a judicial eraser to a typographical error and moving on.  In essence, the United States seeks relief from a complete satisfaction of lien that it prepared, while not surrendering the benefits of the bargain it struck during the foreclosure settlement.  The complete

release is consistent with the proposal that the government accepted during the settlement conference before Judge DeGiacomo.  In return for an immediate payment of less than it was owed, it would release its claims to the property.

It is also clear that the government cannot prevail on a Rule 60(b) theory under the facts of this case.  If the government's "mistake" or "error" was in settling its foreclosure lawsuit by taking less than what was owed it, relief is not available under Rule 60.  That rule does not serve to correct errors of judgment, or as here, "buyer's remorse."  It is well to remember that the government's foreclosure action was disputed.  While it may have been likely that the government would have ultimately prevailed, that outcome was not certain.  Indeed, one need not look farther than United States v. McCall, 235 F.3d 1211 (10th Cir. 2000), to observe that the government can lose even straightforward foreclosures.

Moreover, there was significant benefit to the government in settling the foreclosure litigation. It obtained a substantial amount of money at one time; it obtained its money without the potential of years of legal wrangling and appeals; it saved the significant expenses of further litigation; and it received a guaranteed outcome.  The government also avoided a possible determination that defendant's statute of limitations defense trumped the government's foreclosure claim.  Under these circumstances, it would be difficult to argue that a "mistake" was made in settling.

**B.**     **Los Alamos Credit Union v. Bowling:**

In its Memorandum Opinion, the Bankruptcy Court cited Los Alamos Credit Union v. Bowling, 108 N.M. 113, 767 P.2d 352, 353 (1989) in determining that Mr. Andersen of Farm Services Agency prepared the complete Satisfaction of Lien in error.  In Los Alamos Credit Union, the New Mexico Supreme Court affirmed summary judgment in favor of the credit union.  In that

case, the uncontroverted facts showed that on September 9, 1985, the Bowlings borrowed $65,000 in cash from the credit union and executed a promissory note and mortgage as security.  Payments were made by way of preauthorized automatic deductions from the Bowlings' account to the bank. A clerical error was made to the account on September 13, 1985, when the payment record was transferred, at the Bowlings' request, to another account at the credit union.  Id. at 113.  In April 1986, the assistant treasurer, mistakenly believed that the Bowlings had paid the note, and executed a release of mortgage.  The Bowlings promptly recorded the release.  The error was discovered by the credit union and the note remained unpaid but the Bowlings refused to make any further payments.  The Bowlings argued at foreclosure that the lending institution could not avoid a release properly executed and unambiguous on its face.  Id.  The Court rejected their argument by holding that "a cancellation, release, or surrender of the instrument is ineffective if it is unauthorized, unintentional, or done by mistake."  Id. at 114.

In finding the existence of a clerical error here, the Bankruptcy Court relied on this exact language from Los Alamos Credit Union, and yet the key distinction between that case and the matter here, is that there truly was a "clerical error" in the mechanical handling of the Bowlings' account. Moreover, the bank personnel mistakenly believed that the loan was paid and sent out a release based on that mistaken belief.  Once the mistake became apparent, the bank moved promptly to rectify it. In addition, the release at issue in Los Alamos Credit Union was not the result of a voluntary settlement entered into by the parties as it is here.

Here, the dispute arises because the government  was owed more than it actually received in the settlement of the foreclosure action.  The Bravo Dome settlement would, in effect, make up the difference.

14

In this case, Mr. Andersen testified at trial that he knew there was still a debt owing to the government on the Adee property, before and after the foreclosure settlement was reached.

| | |
|---|---|
| Q: | So even with all the moneys that have been spent by third parties to purchase those properties, the Adees still had a balance due at Farm Services Agency? |
| Mr. Andersen: | That's right. |
| Q: | What as that balance? |
| Mr. Andersen: | As of that date, on May 23 of 2001, it was $310,433.57. |

[Jan. 22, 2002 Tr. at 16.]  In addition, during his deposition Mr. Andersen testified that he knew the difference between complete and partial satisfaction of liens.

| | |
|---|---|
| Mr. Beck: | And [you also have] partial release forms? |
| Mr. Andersen: | That's right. |
| Mr. Beck: | And so you made a conscious decision to use the satisfaction and discharge form rather than the partial release form; is that correct? |
| Mr. Andersen: | Yes. |
| Mr. Beck: | So trial Exhibit C as it appears is the way you wanted it to appear; is that right, when you prepared it? |
| Mr. Andersen: | It was the way I understood the agreement and the judge saying it was to be done. |
| Mr. Beck: | But you didn't mean to use a partial release – |
| Mr. Andersen: | No. |
| Mr. Beck: | – form, you just inadvertently – |
| Mr. Andersen: | No. |
| Mr. Beck: | You used the form that you selected? |

| | |
|---|---|
| Mr. Andersen: | Right. |
| Mr. Beck: | That was the satisfaction of lien form? |
| Mr. Andersen: | Yes. |
| Mr. Beck: | And you had been trained in the use of these forms? |
| Mr. Andersen: | Uh-huh. |
| Mr. Beck: | And you understood the difference between a satisfaction of lien form and a partial release form, at least as your training had – |
| Mr. Andersen: | Yes. |
| . . . | |
| Mr. Beck: | So the partial release is a tool that you have to use if you want to retain the government's lien on certain property, but release the other property? |
| Mr. Andersen: | Yes. |

[Ex. XX, Andersen Dep. at 20-22.]  Unlike Los Alamos Credit Union, this was not a case where Mr. Andersen mistakenly believed the loan was paid off (based on a clerical error in posting to the account) and he simply pulled out or prepared the wrong form as a result of his mistaken belief.  Nor did Los Alamos Credit Union implicate a settlement agreement.  Rather, at the time of the settlement, the government compromised its claim and took less than full value.  The settlement decision was a knowing, willful and voluntary act.  However, when Bravo Dome monies became available, the government viewed its decision as a mistake because it took less than it was owed.

This situation is very different than Los Alamos Credit Union.  Therefore, the Court concludes that Los Alamos Credit Union does not support the Bankruptcy Court's holding that the complete Satisfaction of Lien, prepared by Farm Services Agency, was ineffective.

16

C.      **Sunwest Bank of Clovis v. Garrett**

Although neither the parties nor the Bankruptcy Court cited or referred to Sunwest Bank of Clovis v. Garrett, 113 N.M. 112, 823 P.2d 912 (1992), the facts in Sunwest, rather than those in Los Alamos, seem more analogous to the facts here.  In Sunwest, the borrowers (Garretts) failed to make payments to the bank on a note that had been secured by two mortgages.  Id. at 114, 115.  In 1988, Sunwest, the Garretts, and another bank that was a junior lien holder came up with a plan to reduce the debt.  Under the new plan, the Garretts still would owe some money but the unpaid portion of the debt was to be secured by other property, while the first two mortgages were to be released by Sunwest.  Sunwest issued documents that released the mortgage and the remaining debt (in error).  However, even after the purported release of the remaining debt, Garrett acknowledged and continued to negotiate for settlement of that remaining debt.  Id. at 114.  In 1989, the personal note came due, and Sunwest refused to refinance it until the unpaid debt was paid.  Garrett declined to pay, and Sunwest filed a foreclosure action.  The Garretts raised the defense of release and accord and satisfaction.  The New Mexico Supreme Court relied on Los Alamos Credit Union in finding that the existence of the underlying debt was not in question.  Id. at 115.  Three letters were exchanged among the parties concerning the releases and the fact that the debt was only partially satisfied.  Id. Sunwest testified that the form used releasing the debt was used by mistake and that the intent was to release the mortgages but not the debt.  Testimony also established that Garrett continued to negotiate, after the release, to settle the remaining debt.  Because  there was no evidence refuting the existence of the underlying debt, there was no issue of fact, and the trial court correctly entered a directed verdict in favor of the bank.

Sunwest contains facts closer to those at issue here, but still does not convince the Court that the United States is entitled to escape the complete Satisfaction of Liens that it prepared.  Unlike the United States, Sunwest took prompt action in addressing its mistake.  In addition, there was evidence that after the releases of mortgages were entered, the Garretts themselves continued to engage in conduct acknowledging the existence of the remaining debt.  The fact that the United States never attempted to set aside the settlement agreement, nor to address or correct any possible mistake in its use of a complete release raises serious questions as to whether the government did not intend to do exactly what it did.  Indeed, Mr. Andersen testified that he intended to prepare the complete Satisfaction of Lien that was used.  His error was not one of inadvertence like the mistake at issue in Sunwest.  Finally, the theory of clerical mistake raised for the first time in the middle of trial seems more like the government's afterthought.  The belated attempt to assert such a defense infers that the government did not consider the complete Satisfaction of Liens to have been a mistake.

### D.  Fully Executed and Unambiguous Complete Satisfaction of Liens Cannot Be Avoided

This is not a case where there are allegations of fraud, illegality, bad faith or mutual mistake that might justify setting aside the settlement reached in the foreclosure litigation.  Put most simply, the United States seeks to avoid the effect of the complete Satisfaction of Liens that it prepared, and that its attorney ratified, based on a lack of understanding or a mistake in judgment as to the effect of the complete release.  Mr. Andersen testified that he was unaccustomed to preparing a release or Satisfaction of Lien when there was real estate involved in one proceeding and related proceeds in dispute in another proceeding.  [Jan. 22, 2002 Tr. at 19-20.]  However, that testimony alone is insufficient to set aside the effect of the complete Satisfaction of Liens.

18

The Court finds no basis to excuse the United States from the effect of the complete Satisfaction of Liens.  In executing the release, Mr. Andersen, with advice of counsel, evidenced a conscious and deliberate intention to prepare exactly the documents that were used.  [Ex. XX, Andersen Dep. at 20-21.]  Mr. Andersen may not have understood the consequences of the complete release in relation to the proceeds in the bankruptcy litigation, but certainly counsel for the United States could have understood those consequences.  Mr. Andersen delivered the draft documents to Mr. Lucero, counsel for the United States, before Mr. Lucero provided them to CLT.  [Jan. 22, 2002 Tr. at 114-15.]  Mr. Lucero is a skilled and talented lawyer and had been with the U.S. Attorney's office for seven years working in the areas of commercial and bankruptcy law.  Prior to that position, he worked in a respected law firm specializing in commercial and bankruptcy law.  [Id.]  The means of knowledge were available to Mr. Lucero, since he was involved in both proceedings and has expertise in the area.

Moreover, the Court cannot ascertain how the United States could claim that a complete Satisfaction of Lien that it prepared, reviewed and approved as part of a voluntary settlement agreement should be set aside while it retains the benefit of the settlement.  Parties assume the risk of mistake as to matters intended to be resolved as part of a settlement or compromise.  Ferguson v. Smith, 31 Kan. App. 2d 311, 315, 63 P.3d 1119, 1122 (Kan. Ct. App. 2003); Restatement of Restitution, Section 11.  Such settlement will not be found defective simply because a party is ignorant or mistaken as to the full extent of its rights.  Id.  In the absence of fraud or unconscionability, parties should be held to the terms of their bargain.  Isler v. Texas Oil & Gas Corp., 749 F.2d 22, 23 (10th Cir. 1984).  Courts do not re-write contracts merely because, in the light of a new dawn, a party experiences remorse or determines that another more prudent course of

action should have been taken.  It is simply not the province of the courts to alter or amend a contract that is otherwise legal and binding.  *See id.* (noting that "where the parties are otherwise competent and free to make a choice as to the provisions of their contract, it is fundamental that [the] terms of the contract made by the parties must govern their rights and duties") (*citing* Smith v. Prices Creameries, 98 N.M. 541, 544, 650 P.2d 825, 828 (1982)); Jim v. CIT Financial Services Corp., 87 N.M. 362, 533 P.2d 751 (1975).[9]

Here, the Court concludes that the Satisfaction of Liens are unambiguous in that they completely "satisfy and discharge the lien instruments."  [Ex. C.]  This satisfaction is consistent with the government dismissing its foreclosure claims in exchange for ready cash.  The Satisfaction of Liens form also contains typewritten language "Satisfied by payment of the market value of the security property."  Similarly, the related collateral assignment was fully released.  [Ex. G.]  Nothing in these documents indicates a partial release or that the United States maintains some interest in the mortgages.  The documents were fully executed, and the Court finds no reason to invalidate them. Thus, this Court recommends that the Bankruptcy Court's decision that the Satisfaction of Liens and releases were ineffective be reversed and further recommends remanding the case so that the Bankruptcy Court can dismiss, with prejudice,[10] the United States' claim to the Bravo Dome settlement proceeds at issue.

_____

[9]Issues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law, even where there are federal causes of action in the underlying litigation.  McCall, 235 F.3d at 1215.

[10]The Court declines CLT's invitation to recommend dismissal of the claim to the class action settlement proceeds, without prejudice, so that CLT can seek sanctions against the government.  While CLT relies on McCall for the proposition that they may be entitled to an award of attorney's fees, etc., the Court finds McCall distinguishable.

**<ins>Recommended Disposition</ins>**

That CLT's appeal of the Bankruptcy's Order Sustaining United States' Notice of Perfection of Security Interest and Notice under 11 U.S.C. § 546(B) in Lieu of Seizure of Property and Denying [CLT's] Motion for Order Declaring Void the Notice of Perfection of Security Interest be GRANTED, that the Bankruptcy's Order be reversed as explained above, and that this matter be remanded to the Bankruptcy Court so that the United States' claim to the Bravo Dome settlement proceeds at issue can be dismissed, with prejudice.

Lorenzo F. Garcia
Chief United States Magistrate Judge